STATE v. UNITED NEW JERSEY RAILROAD AND CANAL COMPANY.

Argued November 7, 1907—Decided February 24, 1908.

Taxes authorized by the Railroad Tax act of 1884 (*Pamph. L., p.* 142), were not imposed within the meaning of the Transit act of 1869 (*Pamph. L., p.* 226), until January 1st, 1885, when they became payable, and until that date railroads subject to the Transit act were liable for taxation thereunder.

---

On rule to show cause why *certiorari* should not issue.

Before Justices SWAYZE and TRENCHARD.

For the rule, *James B. Vredenburgh* and *Richard V. Lindabury.*

For the state, *Robert H. McCarter,* attorney-general.

The opinion of the court was delivered by

SWAYZE, J. Upon an application to the Chief Justice for a *certiorari* to review taxes assessed against the railroad companies under the act of 1906 (*Pamph. L., p.* 121), he allowed the writ, upon condition that the railroad pay the amount which would have been assessable under the Railroad

Tax act of 1884, "less any sum or sums heretofore paid on account of the state tax for 1906." The question now is whether that condition was complied with. Counsel have stipulated that the hearing shall proceed as if a writ of *certiorari* had been allowed and return made, to the end that judgment final may be entered, which may be reviewed on writ of error by the Court of Errors and Appeals. They have also waived other objections and agreed that the cases shall be submitted on the question whether $298,128.98, or any part thereof, of the assessment of taxes for the year under review was paid at the time of the making of the order now in question. In view of this stipulation we have not considered whether the procedure provided by section 14 of the Railroad Tax act ( *Gen. Stat., p.* 3328, *pl.* 225) is of such a character that it can be reviewed by *certiorari,* or whether the judgment entered in the Supreme Court is to be reviewed like other judgments of that court, by writ of error only.

The facts are as follows: The railroad company has paid to the state every year since the passage of the Transit act of 1869 (*Pamph. L., p.* 226) $298,128.98. This amount is the same that had been paid in the year 1868 under the then existing legislation. Since 1884 the company has paid, in February of each year, the difference between that sum and the sum assessable under the Railroad Tax act of 1884. The state credits the payments of 1884 and January, 1885, upon taxes under the Transit act of 1869. The company claims that these payments should be credited upon taxes assessed under the Railroad Tax act of 1884. The state's method of stating the account shows the company in arrears for the amount above stated.

In other words, the question is whether payments made by the company, amounting to $74,532.29 each, on April 11th, 1884; July 17th, 1884; October 15th, 1884, and January 21st, 1885, are to be credited upon the tax imposed under the Railroad Tax act of 1884, as the company contends, or upon the tax imposed by what is called the Transit act of 1869 (*Pamph. L., p.* 226), as the state contends. By the acceptance of that act (*Pamph. L.* 1869, *p.* 1487) the company

became liable to pay each year, in quarterly payments, as
theretofore, the sum of $298,128.98, until the legislature
should by general law impose a uniform state tax equally
applicable to all railroads and canal corporations, after which
it was to pay such uniform tax. The amount was fixed by
the sum which the company had paid previous to 1869 by
virtue of a provision that until a general law should be
framed no company theretofore paying transit duties should
pay a less sum than that paid by it for taxes and duties of all
kinds for the year 1868.

By the act of 1884 it was enacted that the tax imposed by
the act should be in lieu of all other taxation. In our opinion,
the question involved is one of statutory construction only,
and cannot be affected by the language of some of the check
vouchers by which the company paid the tax, nor by the
language of the receipts given in 1884 and January 21st,
1885. By the former the company in later years sought to
make the payments applicable to taxes which, under the act
of 1884, became due subsequently to the payments. By the
latter the state receipted for the payments as for taxes due
under the Transit act of 1869. The amount of payments is
not in dispute, and as the receipts given in 1884 did not indi-
cate any other appropriation of payments they must be appli-
cable to the company's liabilities in the order of date. It is
conceded that the company constantly claimed that its only
liability to taxation was under the act of 1869, which it
asserted was an irrepealable contract, and that all payments
in excess of $298,128.98 were voluntary, and made under
section 29 of the act of 1884, so as not to be a waiver of the
alleged contract. It would be quite inconsistent with that
position for the company to claim that payments made by it
under the act of 1869 were, by its own determination, appro-
priated to the payment of taxes under the act of 1884, which
it claimed were illegal. It was, to be sure, entitled to the
benefit of those payments by virtue of section 29 in case the
act of 1884 was legally and constitutionally applicable, but
whether the amount of the voluntary payment was dependent
upon the amount paid under the Transit act in the previous

or in the current year was not determined by this section. The indication, so far as there is any, is that the previous payments were not the decisive factor, for the amount of the voluntary payment depended not upon the difference between the amount of the tax under the act of 1884 and the amounts paid under the act of 1869, but upon the difference between the former amount and the tax "now assessable" against the corporation. The words "now assessable" point rather to an inchoate liability than to a past payment. The company was, in fact, paying quarterly the amount for which it was liable under the act of 1869, and this payment was necessarily continuous, notwithstanding the act of 1884, if the company was to maintain its position that the Transit act constituted an irrepealable contract. What it actually did was to pay, on or about the first of February in each year, beginning February 1st, 1885, an additional sum as a voluntary payment. The question of the year for which the new tax was imposed and the application of the payments thereto could not arise. Whether it was for the year 1884 or 1885, it was payable February 1st, 1885, and the amount of the payment by the company was the same, whether it deducted what it had actually paid in 1884 or what was assessable against it in 1885, if the Transit act were still in force, for the amount under the Transit act was a fixed sum.

This view disposes also of the argument that the company's payments in 1884 and on January 21st, 1885, must have been applicable to taxes for the year 1884. No doubt they were, but it was to taxes under the Transit act of 1869, which the company claimed still governed, and not to taxes under the act of 1884, which the company claimed was not binding.

This view is borne out by the form of receipts given by the state and accepted by the company April 16th, July 17th, October 15th, 1884, and January 21st, 1885, which treat the payments as made under the Transit act of 1869. It was not until May 8th, 1885, that a receipt was given indicating that a question had arisen as to the validity of the act of 1884. It was then, for the first time, that the state accepted a payment as a partial payment under the act of 1884. The subsequent

acceptance, beginning with 1890, by the state officers of check vouchers prepared by the company, which asserted a different claim as to the appropriation of payments and the failure to enforce penalties for deferred payments, cannot estop the state. Neither the treasurer nor the treasurer and comptroller together can thus release the state's claim for taxes.

We proceed therefore to the construction of the statutes. The transit duties, by the terms of the act of 1869, were to be paid until the legislature by general law imposed a uniform state tax. It is not necessary, for the present purpose, to consider the question, which was until recently a mooted one, whether the act of 1884 was such a law. For the purposes of this case it must be assumed to be such, and the question is at what date the legislature imposed the new tax, for at that date the Transit act tax ceased to be payable and the new tax took its place by virtue of the provision of the act of 1884 that the taxes imposed thereby should be in lieu of all other taxation.

In one sense a tax may be said to be imposed by the statute which authorizes it. In another sense it is not imposed until the amount to be paid is determined. There is language in the legislation under consideration which would support the former meaning, but in our view no new tax was imposed, within the meaning of the act of 1869, until the proceeding for the assessment and determination of the amount was complete. The act contemplates the payment of a tax each year, and if we adopt the view that the taxes under the act of 1884 were imposed by the act alone, we are driven to the conclusion that the taxes for years to come were imposed in 1884. It is far more natural to adopt the view that when the act of 1869 used the words "until the legislature shall by general law impose a uniform state tax" it refers to the time when such a tax shall be actually imposed by virtue of a general law. In this view the tax was authorized by the act of 1884 on the day that act was approved. It was not actually imposed earlier than the 1st of December following, when it became a lien, and in our view not until January 1st, 1885, when it became payable. This construction harmonizes with the

probability that the legislature meant that the liability to taxation of railroad property like that of other property should be continuous. The other construction would operate to exempt the railroad from taxation for the year 1884, for there would be no payment required from the time the tax for the last quarter of 1883 was paid until January 1st, 1885, and as the attorney-general forcibly argued, the state, which in 1884 was dependent for the support of the state government upon this very revenue, would be left without means, since under the constitution (*art.* 4, § 6, *pl.* 4) the legislature was practically, in view of existing indebtedness, without power to borrow money even in anticipation of taxes. Such a construction would also, during the year 1884, have put the railroads in a better position than the miscellaneous corporations, for by the act of April 18th, 1884 (*Pamph. L., p.* 232), the taxes thereby authorized for the first time became payable in the following June, and bore interest from July 1st. We cannot persuade ourselves that the legislature meant to abandon existing taxes upon railroad property until the new tax became actually payable.

The fact that the valuation was to be made as of January 1st, 1884, is not persuasive to the contrary. For that purpose a date must necessarily be selected arbitrarily, and doubtless the 1st of January was the most convenient. In the act for the taxation of miscellaneous corporations some are required to state their gross receipts for the year preceding the 1st day of January, prior to the making of the report; others for the year preceding the 1st of February; others are taxed upon their surplus on the preceding 31st day of December, and the General Tax act requires the taxation of property as of May 20th. The selection of these different dates is a matter of convenience in securing data for the purpose of determining the amount of tax, but the dates have no relation to the time of the imposition of tax.

Nor is there any greater force in the argument that if the taxes upon railroads were first imposed for the year 1885 they were payable in advance, while taxes upon other property were not due until the following 20th day of December.

In fact, by the amendment of 1888 the taxes upon railroads were not payable in advance, for that portion which was applicable to general state uses—the larger portion—was authorized to be paid in four equal installments on the 1st days of February, May and August, and the 15th day of October. *Pamph. L.* 1888, *p.* 269, § 10; *Gen. Stat., p.* 3327, *pl.* 221. It is a mistake to regard taxes as assessed for a particular period of a year in duration, as if they accrued from day to day, like interest. They are in practice imposed only once a year, but they constitute a single burden imposed upon the day fixed by law. The legislature may impose a tax each month if it adheres to the constitutional rules of equality and uniformity. Payment of one tax a year does not necessarily secure exemption from a further burden during the year. It would hardly be claimed that the tax on life insurance companies was a tax for the preceding calendar year because the amount depended on the surplus on the preceding 31st of December; or that the franchise tax upon electric light companies was for a period of three hundred and sixty-five days, ending January 31st, or beginning February 1st, of the year in which the tax happened to be imposed; or that the tax upon property under the general law was either for the calendar year in which the particular 20th of May happened to fall, or for a period of twelve months preceding or following that date. The owner on May 20th is liable for the whole tax of the year, notwithstanding a subsequent alienation before the tax becomes payable. *State, Shippen* v. *Hardin,* 5 *Vroom* 79. And the tax is no encumbrance during the time intervening between May 20th and December 20th, although it is payable sooner. *Bradley* v. *Dike,* 28 *Id.* 471; *Johnson* v. *Van Horn,* 16 *Id.* 136.

These cases lead logically to the result that taxes are imposed, not for a particular year, calendar or fiscal, but on a particular day.

The prosecutors argue that upon the contention of the state their local taxes of 1906, payable on December 20th, would be illegal, because in violation of the rule of uniformity, for the reason that taxes for that year must have been paid by the

railroads on February 1st, 1906. This argument, however, applies only to the legality of the later local taxes. That question is not now before us.

Our conclusion is that the prosecutor did not comply with the condition upon which the original writ of *certiorari* was allowed by the Chief Justice, and fell short of making the payment required by the sum of $298,128.98. The proceedings brought up by this present writ are therefore affirmed, with costs.